**WO** JL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Vivian Price, et al,

Plaintiffs,

v.

Maricopa County, et al.,

Defendants.

No. CV-25-01912-PHX-KML (ASB)

**ORDER**

In early June 2023, Phoenix Police Department ("PPD") officers arrested Anthony Price. After telling the officers he was diabetic and that his glucose level was high, Anthony was transported to the hospital by ambulance. Anthony was released from the hospital that same day, taken into custody by a PPD officer, and ten hours later booked into a detention facility operated by Maricopa County. Anthony died a few hours after arriving at the detention facility. Anthony's mother, plaintiff Vivian Price, in her individual capacity and as the personal representative of Anthony's estate, brought this civil rights action (along with two of Anthony's children). The current complaint names as defendants the City of Phoenix, nine PPD officers, Maricopa County, and nine Maricopa County employees. The complaint is woefully inadequate, and it is dismissed. Plaintiffs are granted leave to amend but an amended complaint must be *significantly* improved if plaintiffs hope to proceed.

## I. Background

The defendants named in the operative complaint fall into two groups: those associated with Maricopa County and those associated with the City of Phoenix. The

Maricopa County defendants are:

- Maricopa County itself;
- Maricopa County Sheriff's Office (MCSO) Captain Jannis Mossman, "commander" at the detention facility;
- MCSO Sergeant Trainor, supervisor at the detention facility;
- Detention Officers Amir Ashrafzadeh, Yvette Dozal, Wong, C. Perkles, Everett, and K. Dodd;
- Correctional Health Services (CHS) nurse practitioner Danielle Fedor;[1]
- John and Jane Does 21-40, other CHS employees; and
- John and Jane Does 41-60, other MCSO employees.

Plaintiffs identify the "MCSO Defendants" as all the individuals associated with Maricopa County except Fedor.

The City of Phoenix defendants are:

- City of Phoenix itself;
- PPD Detectives Erik Infiesto, Jeremy Prater, Scott Thompson, Calvin Martin, Ryan Roberts, Rick Timney, Ryan Lee, and Phil Belsterling;
- PPD Sergeant Ramel Colclough; and
- John and Jane Does 1-20, unidentified City of Phoenix employees.

(Doc. 28.) Plaintiffs identify the individuals associated with the City of Phoenix as the "FAID Defendants," because of their affiliation with the PPD's Fugitive Apprehension and Investigative Detail. Plaintiffs sometimes combine the MCSO Defendants with the FAID Defendants and refer to that combined group as the "Individual Defendants."

The complaint attempts to group the various defendants together and allege everyone in that group was involved in particular acts. For example, the first meaningful factual allegation involves the actions of the FAID Defendants, with no effort to explain what each defendant allegedly did. That pattern persists throughout the complaint with only

---

[1] Defendant Danielle Fedor is now known as Danielle Trainor, but for clarity, the Court will refer to her as Fedor.

rare exceptions where plaintiffs identify acts taken by a particular defendant. Based on this imprecision, the current facts must be described at a very high level of generality.

The FAID Defendants arrested Anthony at approximately 2:45 p.m. on June 1, 2023. (Doc. 28 at 11.) Anthony, who was diabetic, "advised the FAID Defendants" that his glucose level was high and began exhibiting symptoms of hyperglycemia. (Doc. 28 at 11.) Around 3:18 p.m., Anthony was transported by ambulance to the hospital. (Doc. 28 at 11-12.) At the hospital, Anthony's glucose level was 599 mg/dL and he was given insulin. Around 5:08 p.m., Anthony's glucose level remained "dangerously high" at 439 mg/dL, but the hospital discharged him into the custody of PPD officer Prater. (Doc. 28 at 12.)

The FAID Defendants, along with Does 1-20, did not provide Anthony with any medical care for the next ten hours. The complaint does not explain where Anthony spent that time, what care he may have needed, or why plaintiffs believe all FAID Defendants remained with him for the entire period. (Doc. 28 at 12.) Around 3:24 a.m. on June 2, 2023, Anthony was booked into Maricopa County's Intake, Transfer, and Release, a detention center in Phoenix. At the detention center, Anthony had an initial screening that made Does 21-40 "concerned with [his] dangerously high glucose level." Does 21-40 recommended Anthony be assigned to a cell designated for medical treatment. (Doc. 28 at 12.) At 4:55 a.m., Does 41-60 ignored the recommendation and placed Anthony into a non-medical isolation cell due to his allegedly combative nature. (Doc. 28 at 12.)

Between 6:45 a.m. and 12:10 p.m. on June 2, detention officers Ashrafzadeh and Dozal conducted 14 security walks in the isolation hallway. During that time, Ashrafzadeh and Dozal "never provided direct-view safety checks" to assess Anthony's "presentation and his need for medical treatment." (Doc. 28 at 13.) At 11:00 a.m., Anthony appeared remotely for an initial court hearing regarding his pending charges. (Doc. 28 at 13.) Anthony was not released. At 12:17 p.m., surveillance footage captured Anthony collapsing face first onto the ground of his cell and struggling to return to his feet. (Doc. 28 at 13.) At 12:21 p.m., Anthony "ceased all movement." (Doc. 28 at 13.) At 12:38 p.m., during a security walk, Ashrafzadeh opened the door to Anthony's cell and found Anthony

unresponsive with no pulse. (Doc. 28 at 13.) The MSCO Defendants, Fedor, and Does 21-40 administered CPR and deployed an Automated External Defibrillator and a Lund University Cardiopulmonary Assisted System. (Doc. 28 at 13-14.) Fedor knew Anthony had been "booked into [the detention facility] with a dangerously high glucose level, yet rather than provide insulin, [Fedor] administered four doses of Narcan between 12:41 p.m. and 12:47 p.m." (Doc. 28 at 14.)

At 12:51 p.m., the Phoenix Fire Department arrived and transported Anthony to the hospital where he was pronounced dead. At the time of his death, Anthony's glucose level was 397 mg/dL. (Doc. 28 at 14.) Plaintiffs filed this suit in June 2025. (Doc. 1.) Before any defendant responded, plaintiffs filed an amended complaint. (Doc. 28.) That amended complaint is the operative pleading, and it alleges four counts against different groups of defendants.

Count One asserts a Fourteenth Amendment medical care claim against all the Individual Defendants, *i.e.* all named and unnamed individual defendants. (Doc. 28 at 20.) Unwilling or unable to provide allegations of what each defendant did, the complaint contains vague allegations that the "Individual Defendants" were aware of Anthony's "serious medical condition" and did not respond appropriately. (Doc. 28 at 22.) Paragraph 85 of the complaint highlights the trouble with plaintiffs' allegations. That paragraph alleges the Individual Defendants "should have appreciated the high degree of risk placing [Anthony] in Isolation Cell H5" and should have taken "reasonable measures to abate" that risk. (Doc. 28 at 22.) Plaintiffs do not explain how all the Individual Defendants—which include the FAID Defendants, the MCSO Defendants, and 60 John and Jane Does (Doc. 28 at 14)—would have known of this placement or been able to control it. For example, there are no allegations the FAID Defendants dictated Anthony's cell placement in a facility operated by Maricopa County. And the complaint internally contradicts its allegations that all Individual Defendants failed to appreciate the risk. The complaint states the decision to place Anthony in that cell was contrary to the recommendation from Does 21-40, and it was Does 41-60 (not any of the other Individual Defendants) who ignored

that recommendation and placed Anthony in a non-medical cell. (Doc. 28 at 13.)

The only allegations tied to specific defendants supporting Count One are that Trainor (a supervisor at the detention facility) "should reasonably have been aware" of Anthony's condition, Ashrafzadeh and Dozal deprived Anthony of his right to direct-view safety checks, and Fedor failed to provide the correct medical treatment. (Doc. 28 at 22.) There are no factual allegations establishing *why* Trainor should have been aware, nor factual allegations explaining the type of direct-view safety checks plaintiffs believe were required or what they would have shown. Similarly, there are no allegations establishing how Fedor would have known Anthony needed insulin, not Narcan.

Count Two asserts a *Monell* claim against the City of Phoenix and Maricopa County. (Doc. 28 at 23 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).) Plaintiffs begin with the incoherent allegation that Maricopa County "had a policy or established custom in place on regarding the administration of a detainee's medical treatment together with their Fourteenth Amendment in situations such as the one involving [Anthony]." (Doc. 28 at 23.) Whatever that means, plaintiffs seem to be alleging the relevant policy or custom consisted of depriving pretrial detainees of "the right to adequate medical treatment." (Doc. 28 at 23.) Bizarrely, plaintiffs lump the City of Phoenix and Maricopa County together and identify them as the "Government Defendants." Plaintiffs assert the "Government Defendants ratified the Individual Defendants' deliberately indifferent conduct towards [Anthony's] Fourteenth Amendment right[s]." (Doc. 28 at 23.)

Plaintiffs' choice to group the two different entities together mean they seem to believe Maricopa County has a policy or custom of ratifying deliberately indifferent conduct by PPD officers regarding medical care provided in detention facilities operated by Maricopa County. There is no explanation how that would occur. Plaintiffs further claim the "Government Defendants' policy, pattern of practice, of condoned misconduct is tacitly or overtly ratified by the Government Defendants' failure to train and supervise the Individual Defendants." Again, how one municipality might fail to train or supervise employees of another municipality is not explained.

Count Three asserts a Fourteenth Amendment claim for loss of companionship against the Individual Defendants. Plaintiffs allege the "Individual Defendants' deliberate indifference, especially when they had hours to deliberate their actions and/or inactions, shocks the conscience and deprived the Plaintiffs of their protected Fourteenth Amendment liberty interest in [Anthony's] continued companionship." (Doc. 28 at 25.) It is not entirely clear what acts or failures this claim involves, but at the very least there are no allegations establishing *each* of the Individual Defendants "had hours to deliberate."

Finally, Count Four asserts a Fourteenth Amendment claim for loss of companionship against the City of Phoenix and Maricopa County. This seems to be similar, if not identical, to Count Two in that plaintiffs allege the Government Defendants had a policy or custom involving the Individual Defendants engaging in deliberately indifferent conduct regarding "a detainee's medical treatment." (Doc. 28 at 25.) As with Count Two, combining the City of Phoenix and Maricopa County together in a single *Monell* claim makes no sense.

**II. Motions to Dismiss**

The City of Phoenix defendants and Maricopa County defendants seek dismissal of the complaint. (Docs. 54, 55.) Both motions argue the complaint does not sufficiently identify the actions taken by each defendant. The motion from the City of Phoenix defendants is especially clear on this, arguing plaintiffs have filed a forbidden "shotgun pleading." (Doc. 54 at 5.) Although plaintiffs disagree, their complaint "is a textbook example" of a shotgun pleading. (Doc. 54 at 5.)

"The goal" of Rule 8(a) "is to provide sufficient notice so the parties and the court can focus litigation on the merits of a claim." *Gibson v. City of Portland*, 165 F.4th 1265, 1287 (9th Cir. 2026) (simplified). This requires a complaint "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). One type of shotgun pleading that violates these principles is a complaint that "asserts multiple claims against multiple defendants without specifying which of the defendants are responsible for which

acts or omissions." *Gibson*, 165 F.4th at 1288 (simplified).

Here, plaintiffs group the individual defendants as the FAID Defendants, the MCSO Defendants, and combine those two groups as the Individual Defendants. Plaintiffs also group the City of Phoenix and Maricopa County together as "Government Defendants." Plaintiffs make almost no effort to identify actions taken by each individual or the policies attributable to either of the municipalities. Plaintiffs admit to this grouping but seem to believe it is appropriate. For example, plaintiffs argue the complaint identifies each individual under the various collective names and the complaint "clearly identif[ies]" the first and second counts as brought against all individuals. (Doc. 62 at 6.) Plaintiffs apparently believe it is sufficient to identify the claims asserted against individuals without even hinting at facts supporting that individual's involvement. It is not. A complaint must set forth the acts of each defendant so that each has "fair notice" of the basis for plaintiffs' claim and a meaningful opportunity to defend against those factual allegations. *Starr*, 652 F.3d at 1216.

The court has "inherent authority to control its docket" and it is not required to "accept . . . shotgun pleadings." *Id.* at 1289. Based on plaintiffs' pervasive group pleading, the complaint must be dismissed in its entirety. But even assuming the court could somehow overlook the complaint's shotgun nature, all the claims must be dismissed on other grounds as well.

**A. Medical Care (Count One)**

"[C]laims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (simplified). To state a medical care claim, plaintiffs must allege

> (i) the defendant made an intentional decision with respect to the conditions under which [Anthony] was confined; (ii) those conditions put [Anthony] at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official

> in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused [Anthony's] injuries.

*Id.* at 1125. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn[] on the facts and circumstances of each particular case." *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (simplified). Of special importance here, an officer cannot be liable for unlawful conduct simply because of his membership in a group without a showing of individual participation in the unlawful conduct. *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996). Rather, an officer's liability must be predicated on his "personal involvement" or "integral participation" in the alleged violation. *Id.* at 294-95. "'Integral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation," *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004), but there must have been some "fundamental involvement in the conduct that allegedly caused the violation," *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007).

**1. FAID Defendants**

Plaintiffs make no specific allegations against Infiesto, Thompson, Martin, Roberts, Belsterling, Colclough, or Timney. Instead, plaintiffs allege all the FAID Defendants were aware that Anthony's blood glucose level was dangerously high and the court may therefore reasonably infer that "most" of the FAID Defendants "intentionally did not inform [PPD] staff that [Anthony's] blood glucose required continued monitoring because he had received prior treatment." (Doc. 62 at 10.) It is not clear what other PPD staff plaintiffs are referring to with this argument. And absent underlying factual allegations describing how *each* defendant knew or should have known that Anthony was diabetic and had a dangerously high glucose level after being discharged from the hospital, it is not reasonable to infer that *each* defendant intentionally failed to inform (unidentified) staff that Anthony's condition required monitoring.

Plaintiffs do make a specific allegation regarding defendant Lee, but that allegation

is only that Lee followed the ambulance to the hospital. This allegation is insufficient to support that Lee made any intentional decision with respect to Anthony's medical care, let alone that the decision put Anthony at substantial risk of suffering serious harm. Likewise, plaintiffs allege that after Anthony was discharged from the emergency department, defendant Prater took Anthony into custody. This allegation does not support that Prater made any intentional decision that put Anthony at substantial risk of suffering serious harm because there are no allegations to suggest that Prater was given any information regarding plaintiff's condition or was even present for his subsequent detention.

Plaintiffs argue that they are at an informational disadvantage and that their allegations based on "information and belief" are sufficient. Plaintiffs assert discovery will "hopefully consist of reports and documentation to cover" the ten hours that Anthony was in the custody of the City of Phoenix Defendants after his release from the hospital. (Doc. 62 at 7.) In support, plaintiffs cite other district courts that have concluded "[w]here a plaintiff is at an informational disadvantage—where the information necessary to plead with greater specificity is in the possession of the defendant—courts give plaintiffs some benefit of the doubt to go along with the specific facts it has pled." *Twede v. Univ. of Washington*, 309 F. Supp. 3d 886, 904–05 (W.D. Wash. 2018) (simplified). Plaintiffs overlook the crucial part of that quote: the benefit of the doubt goes along with "the specific facts . . . pled." *Id.* (simplified). Here, plaintiffs have pleaded almost no specific facts regarding any defendant. Plaintiffs are not seeking "some benefit of the doubt"—they are asking for blind faith. *Id.* (simplified). That is not permitted.

In general, "plaintiffs must satisfy the pleading requirements of Rule 8 *before* the discovery stage, not after it." *Mujica v. AirScan Inc.*, 771 F.3d 580, 593 (9th Cir. 2014). Count One against the FAID Defendants is dismissed.

**2. Maricopa County Defendants**

As noted, plaintiffs must allege that a defendant was aware of and disregarded a substantial risk of serious harm to Anthony to state a medical care claim. Plaintiffs allege that between 6:45 a.m. and 12:10 p.m., Ashrafzadeh and Dozal conducted 14 security

walks of the Isolation Hallway and "never provided direct-view safety checks to assess Anthony's presentation and need for medical treatment." (Doc. 28 at 13.) At 12:38 p.m., during a security walk, Ashrafzadeh found Anthony unresponsive with no pulse. (Doc. 28 at 13.) Plaintiffs' allegations can be construed as asserting two slightly different claims against Ashrafzadeh and Dozal: first, that those defendants put Anthony at substantial risk of serious harm by failing to "provide[] direct-view safety checks," and second, that they were of aware of Anthony's diabetes and dangerously high glucose level but failed to obtain medical assistance for him.

Plaintiffs' allegation that Ashrafzadeh and Dozal failed to provide "direct-view" safety checks is too vague to state a claim. Plaintiffs do not describe what Ashrafzadeh and Dozal did on their safety walks or what a satisfactory "direct-view" safety check would entail in this context. *See Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) ("direct-view safety checks" must be "sufficient to determine whether [a detainee's] presentation indicates the need for medical treatment"). Plaintiffs also fail to allege any facts showing Ashrafzadeh or Dozal knew Anthony was diabetic, that a medical cell had been requested but denied, that Anthony's glucose levels were dangerously high, or that he would have exhibited some symptoms if Ashrafzadeh and Dozal had directly viewed him. Regardless of which type of claim plaintiffs are attempting to pursue, the present allegations are insufficient.

Plaintiffs also allege that while the MCSO Defendants and Defendants Does 21-40 were administering life-saving aid to Anthony, Fedor administered four doses of Narcan between 12:41 p.m. and 12:47 p.m. Plaintiffs fail to allege how such conduct constituted deliberately indifferent medical care. Plaintiffs allege no facts to support that Fedor knew Anthony was diabetic or that his glucose levels were dangerously high. Rather, plaintiffs' allegations suggest that Fedor was summoned to provide emergency aid when Anthony was found unresponsive and did so. Plaintiffs fail to state a medical care claim against the MCSO Defendants or Fedor.

**B. Loss of Companionship (Count Three)**

"The substantive due process right to family or to familial association is well established," and the state's interference with this liberty interest without due process of law is remediable under § 1983.[2] *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1079 (9th Cir. 2011). "To amount to a violation of substantive due process, however, the harmful conduct must 'shock [ ] the conscience' or 'offend the community's sense of fair play and decency.'" *Id.* (simplified). The "shocks-the-conscience" standard is, depending on the circumstances, met either by showing that a defendant (1) acted with "deliberate indifference" or (2) with a "purpose to harm" for reasons unrelated to legitimate law enforcement objectives. *Porter v. Osborn*, 546 F.3d 1132, 1137 (9th Cir. 2008). Under the first situation, if a defendant is in a position "[w]here actual deliberation is practical," then his deliberate indifference to the harm he caused may be sufficient to "shock the conscience." *Gantt v. City of Los Angeles*, 717 F.3d 702, 707-08 (9th Cir. 2013). "On the other hand, when an officer makes a snap judgment because of an escalating situation," courts apply the "purpose-to-harm" standard. *Id.* (simplified).

Plaintiffs' collective allegations against the individual City of Phoenix Defendants are insufficient to state a loss-of-companionship claim. Because plaintiffs have not identified any specific conduct by Infiesto, Thompson, Martin, Roberts, Belsterling, Colclough, and Timney, plaintiffs fail to state a claim for loss of familial association against them. Lee followed the ambulance to the hospital and Prater took Anthony into custody after he was discharged from the emergency department, but these allegations do not show deliberate indifference or purpose to harm.

---

[2] In general, "parents maintain a constitutionally protected liberty interest in the companionship of their adult children." *Sinclair v. City of Seattle*, 61 F.4th 674, 679 (9th Cir. 2023). But the scope of this liberty interest is not entirely clear. *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1058 (9th Cir. 2018) ("even biological parents must maintain consistent involvement in a child's life and participation in child-rearing activities for their relationship to be entitled to the Fourteenth Amendment protections at issue here"). There is no need to reach the issue here because of other pleading failures. But to prevent any future dispute on this issue, plaintiffs' amended complaint should contain allegations regarding the nature of their relationships with Anthony.

Plaintiffs likewise fail to state a Fourteenth Amendment loss-of-companionship claim against the individual Maricopa County defendants. Plaintiffs allege Ashrafzadeh and Dozal conducted 14 security walks between 6:45 a.m. and 12:10 p.m. but "never provided direct-view safety checks to assess Anthony's presentation and need for medical treatment." Absent additional factual context, these allegations do not show deliberate indifference or purpose to harm. Similarly, the bare allegation that Fedor administered Narcan to Anthony while officers attempted life-saving measures does not amount to the type of conduct sufficient to support a loss-of-companionship claim.

**C. *Monell* Claims (Counts Two and Four)**

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 690, 694. The plaintiff must also allege that the municipality acted with "deliberate indifference" to his constitutional rights. *Castro*, 833 F.3d at 1076.

"A plaintiff can satisfy *Monell*'s policy requirement in one of three ways." *Gordon*, 6 F.4th at 973. First, there may be "an expressly adopted official policy." *Id.* (simplified). Second, there may be a "longstanding practice or custom." *Id.* (simplified). Third, "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Id.* at 974 (simplified).

If plaintiffs hope to pursue a claim based on an alleged custom, the custom cannot be "based on isolated or sporadic incidents; [liability] must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Sabra v. Maricopa County Community College District*, 44 F.4th 867 (9th Cir. 2022) (simplified); *see also Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999) ("A single constitutional deprivation ordinarily is insufficient to establish a

longstanding practice or custom.").

As an initial matter, plaintiffs collectively refer to the City of Phoenix and Maricopa County as the "Government Defendants," but they are not the same municipality and plaintiffs do not explain why policies can be attributed across the two. For this reason alone, plaintiffs' allegation that Maricopa County "had a policy or established custom in place . . . regarding the administration of a detainee's medical treatment together with their Fourteenth Amendment [*sic*] in situations such as the one involving [Anthony]" is not sufficient to state a claim against the City of Phoenix. Plaintiffs' failure to differentiate between the two entities makes the difficult task of identifying the exact policy, practice, or custom they are attempting to allege caused them harm next to impossible.

**1. City of Phoenix**

Plaintiffs fail to identify a particular City of Phoenix policy, custom, or ratification linked to a violation of Anthony's constitutional rights. Plaintiffs cite four incidents in which a person in the custody of the Phoenix Police Department died. Two of those incidents occurred several months after Anthony's death, and one occurred more than a year afterwards. Incidents that post-date the purportedly violative conduct do not show actual or constructive notice on the part of a municipality. *See Connick v. Thompson*, 563 U.S. 51, 63 (2011) ("[C]ontemporaneous or subsequent conduct cannot establish a pattern of violations that would provide "notice to the cit[y] and the opportunity to conform to constitutional dictates").

The remaining incident, which plaintiffs allege occurred in 2017, was "the pinning [of a detainee] to the ground by his head and neck and cutting off his air supply," resulting in his death. This incident is not sufficiently similar to the misconduct alleged here because it did not involve a failure to provide medical care. And even if plaintiffs had identified a single other incident, it is unlikely that would be sufficient to plead the existence of a custom or policy. *Navarro v. Block*, 72 F.3d 712, 714 (9th Cir. 1995) ("Proof of random acts or isolated events is insufficient to establish custom."); *Oyenik v. Corizon Health Inc.*, 696 F. App'x 792, 794 (9th Cir. 2017) ("one or two incidents are insufficient to establish

a custom or policy”). Plaintiffs make no allegations regarding ratification by City of Phoenix policymakers. Plaintiffs do not state a *Monell* claim against the City of Phoenix.[3]

### 2. Maricopa County

Plaintiffs likewise fail to identify a particular Maricopa County policy, custom, or ratification linked to a violation of Anthony’s constitutional rights. Plaintiffs allege in-custody deaths in Maricopa County jails have “skyrocketed” in recent years, providing (mostly) rising numbers from 2019 through 2024. Plaintiffs cite three specific incidents in which detainees confined in a Maricopa County jail died in custody. Two of the incidents occurred after Anthony’s death and, as set forth above, cannot support that the County had actual or constructive notice of a pattern that existed at the time of his death. *Connick*, 563 U.S. at 63. In the third incident, on September 21, 2021, an inmate died “after suffering from severe dehydration for four days but did not receive treatment from MCSO detention officers.” Based on the minimal facts plaintiffs provide regarding that incident, it is not sufficiently like this case to support a patten of deliberate indifference to detainees’ medical care. Plaintiffs also cite an incident in which the City of Phoenix and Maricopa County settled a case involving a “near-deadly attack” of an inmate by another inmate. That incident is not like this case because it did not involve a death in custody or the failure to provide adequate medical care. One incident of an individual dying in custody in dissimilar circumstances does not plausibly plead a pattern of constitutional violations. Plaintiffs fail to state a *Monell* claim against Maricopa County based on a policy, custom, or ratification.[4]

## III. Leave to Amend

Plaintiffs are granted leave file an amended complaint but as illustrated by this order, any amended complaint must significantly improve on their current effort. Plaintiffs

---

[3] Plaintiffs make no allegations regarding any training or supervision the individual City of Phoenix Defendants received, let alone any allegations that the training or supervision was so inadequate as to amount to deliberate indifference.

[4] Plaintiffs make no specific allegations regarding any training or supervision the individual Maricopa County Defendants received, let alone any allegations that the training or supervision they received amounted to deliberate indifference. Plaintiffs fail to state a *Monell* claim against Maricopa County based on a failure to train or supervise.

must allege facts and actions regarding each named defendant and plead facts support each element of the causes of action they seek to pursue.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motions to Dismiss (Doc. 54, 55).

(2) Defendants' Motions to Dismiss (Doc. 54, 55) are **granted**. Within **14 days** of the filing date of this order, plaintiffs may file a second amended complaint. That amended complaint must be accompanied by a redline identifying how the amended complaint differs from the currently operative complaint.

Dated this 24th day of September, 2026.

Krissa M. Lanham

**Honorable Krissa M. Lanham**
**United States District Judge**